UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

    Plaintiff,

v.

SHEILA M. VAN DYKE,

    Defendant.
_____/

Hon. Ellen S. Carmody

Case No. 1:09-CR-375

**OPINION**

This matter is before the Court on <u>Defendant's Motion to Suppress Evidence</u>. (Dkt. #11). On January 8, 2010, Defendant consented to proceed in this Court for all further proceedings. On January 29, 2010, Defendant filed the present motion to suppress. For the reasons discussed below, Defendant's motion is **granted**.


**BACKGROUND**

While many of the facts in this matter are in dispute, the following is not disputed. On the morning of April 22, 2009, Fredrick Lutz was questioned by Emmett Township Detective Brady Keys. During this questioning, Lutz indicated that there existed evidence that Defendant had engaged in mail theft. Lutz indicated that the evidence in question was located at 419 Bowers Ave., Battle Creek. Detective Keys later spoke with United States Postal Service Special Agent Ted Andersen. Special Agent Andersen subsequently traveled to Emmett Township and spoke with Lutz. Following this conversation, Fredrick Lutz, Special Agent Andersen, and Detective Keys traveled (in separate vehicles)

to 419 Bowers Ave. for the purpose of retrieving the evidence of Defendant's alleged unlawful behavior. The residence at 419 Bowers was rented in Defendant's name.

Upon arriving at the residence, Lutz discovered that he was unable to enter the residence through either of the exterior doors. The door to one entrance was secured with a padlock to which Lutz did not possess a key. The door to the other entrance was secured with a more traditional lock to which Lutz likewise did not possess a key. Lutz subsequently entered the residence by removing an air conditioning unit and crawling through the open window. Once inside the residence, Lutz seized the evidence allegedly demonstrating that Defendant had stolen items from the mail. Lutz provided this evidence to Special Agent Andersen who later that day questioned Defendant about the matter. Defendant initially denied stealing mail, but when presented with the items seized from her residence made incriminating statements.

Defendant was eventually charged with one misdemeanor count of delay or destruction of the mail, in violation of 18 U.S.C. § 1703(b). Defendant now moves, pursuant to the Fourth Amendment, to suppress the evidence seized from her residence as well as her subsequent incriminating statements.

**ANALYSIS**

While Defendant has moved to suppress the evidence in question, because the search was not conducted pursuant to a search warrant the burden of demonstrating the lawfulness of such falls on the United States. In *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), the Court indicated that:

> searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well delineated exceptions. The exceptions are jealously and carefully drawn,

and there must be a showing by those who seek exemption. . .that the exigencies of the situation made that course imperative. The burden is on those seeking the exemption to show the need for it.

*Id.* at 454-55.

More recent decisions have affirmed this principle. *See, e.g., United States v. Chambers*, 395 F.3d 563, 569 (6th Cir. 2005) (recognizing that "[t]he burden is on those seeking the exemption [from the warrant requirement] to show the need for it); *United States v. Yoon*, 398 F.3d 802, 805 (6th Cir. 2005) (same); *United States v. Brown*, 449 F.3d 741, 744-45 (6th Cir. 2006) (the police "bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests"). With respect to this issue, the leading treatise likewise observes:

> With respect to the issue which is usually central in a motion to suppress hearing - the reasonableness of the challenged search or seizure - most states follow the rule which is utilized in the federal courts: if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution. The warrant-no warrant dichotomy is typically explained on the ground that when the police have acted with a warrant "an independent determination on the issue of probable cause has already been made by a magistrate, thereby giving rise to a presumption of legality," while when they have acted without a warrant "the evidence comprising probable cause is particularly within the knowledge and control of the arresting agencies." (This means, of course, that if the magistrate's probable cause decision has now been found to be erroneous, prompting the prosecution to fall back upon the "good faith" doctrine, the burden is on the prosecution to establish the "objectively reasonable" reliance required thereunder.) Moreover, it is said that "[w]ithout such a rule there would be little reason for law enforcement agencies to bother with the formality of a warrant."

Wayne LaFave, *Search and Seizure*, § 11.2(b) (4th ed. 2004).[1]

---

[1] The Court notes that the issue of which party bears the burden on a suppression issue is distinct from what a movant must demonstrate if her standing to seek the suppression of certain evidence is challenged. In addressing the latter issue, courts hold that the proponent of a motion to suppress "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978). However, this particular standard applies to the question of standing and is distinct from the question of which party bears the burden when the lawfulness of a search is challenged. The United States has not challenged Defendant's standing and the record contains no evidence calling into question her standing to challenge the lawfulness of the search in question. *See, e.g., United States v. Washington*, 573

As for the substance of Defendant's motion, the Fourth Amendment to the United States Constitution provides, in relevant part, that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A warrantless search of a private residence is presumptively unreasonable and, therefore, unlawful, unless justified by an exception to the warrant requirement. *See Brown*, 449 F.3d at 744. The government opposes Defendant's motion on the following grounds: (1) the search was conducted by a private individual not acting as an agent of the government; (2) Fredrick Lutz possessed actually authority to enter and search the residence; and (3) even if Lutz did not possess actually authority to enter and search the residence, the police reasonably believed that such was the case.

I.  **Was Lutz Acting as a Government Agent**

The United States urges that Defendant's motion be denied because neither Detective Keys nor Special Agent Andersen participated in or conducted the search in question. The government is correct that the protections afforded by the Fourth Amendment extend only to action undertaken by the government. As the Supreme Court has observed, the Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation and knowledge of any governmental official." *Jacobsen*, 466 U.S. at 113. As is well recognized, however, "permitting the government to circumvent the limits of the Fourth Amendment by directing individuals to conduct searches that the government cannot,

---

F.3d 279, 282-83 (6th Cir. 2009) (an individual has standing to challenge a search of a particular location if she possesses a subjective expectation of privacy therein which society recognizes as objectively reasonable).

would totally undermine the purposes of the Fourth Amendment." *United States v. Boumelhem*, 339 F.3d 414, 425 (6th Cir. 2003).

Accordingly, when a "private individual," who is not ordinarily subject to the Fourth Amendment's proscriptions, "acts at the direction of law enforcement agents, the 'private' search must comport with the Fourth Amendment." In such circumstances, the private individual is acting as an agent of the law enforcement agency and is, therefore, "subjected to the same restrictions as the law enforcement agency." *Id.* (citations omitted). A private individual will not be found to be acting as a government agent simply because there existed contact or interaction between the private individual and law enforcement personnel prior to the search in question. *See United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). Instead, a private individual will be held to be acting as a "police agent" only where (1) the police "instigated, encouraged or participated in" the search, and (2) the private individual "engaged in the search with the intent of assisting the police in their investigative efforts." *Id.* (citations omitted); *see also*, *United States v. Bruce*, 396 F.3d 697, 705 (6th Cir. 2005) (disagreed with in part on other grounds by *United States v. McDaniel*, 398 F.3d 540 (6th Cir. 2005)) (citing *Lambert*, 771 F.2d at 89).

The evidence presented at hearing revealed that both of these factors are satisfied. While there exists conflicting evidence as to whether Lutz or Detective Keys first broached the subject of Defendant's allegedly illegal behavior, Detective Keys and Special Agent Andersen both testified that they encouraged the search. Moreover, Lutz testified that he believed that he was conducting the search for the purpose of investigating whether Defendant had acted unlawfully. Neither Detective Keys nor Special Agent Andersen disputed this point. Accordingly, the Court finds that when Fredrick Lutz conducted the search in question, he was acting as an agent of the government.

**II.        Did Lutz Possess Actual Authority to Search the Residence**

As previously noted, when a private individual "acts at the direction of law enforcement agents, the 'private' search must comport with the Fourth Amendment." In such circumstances, the private individual is acting as a government agent and is, therefore, subject to the same limitations as the law enforcement officers. The government argues that even if Lutz is deemed to have been acting as a government agent when he searched the residence, the search is nonetheless lawful because Lutz possessed actual authority to enter the residence and all areas therein.

One of the exceptions to the general requirement that a home can be searched only pursuant to a valid search warrant, is that a search conducted "with the voluntary consent of an individual possessing authority" satisfies the Fourth Amendment. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citation omitted). Such individual "might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent." *Id.* (citations omitted).

For purposes of Fourth Amendment analysis, common authority does not depend on "property rights," but derives from the "*mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

When determining whether "common authority" exists, courts consider various factors none of which appear to be dispositive. *See, e.g., Pratt v. United States*, 214 Fed. Appx. 532, 535 (6th Cir., Jan. 22, 2007) (considering such factors as whether the individual: (1) owned the residence or was

named on the lease; (2) contributed rent; (3) visited when the co-occupant was not present; and (4) possessed a key); *United States v. Murphy*, 516 F.3d 1117, 1123 (9th Cir. 2008) (considering such factors as whether the individual: (1) possessed a key; (2) stored personal belongings in the residence; and (3) possessed the ability to entertain guests); *United States v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006) (considering such factors as whether the individual: (1) possessed a key to the premises; (2) admitted to living at the residence; (3) possessed a driver's license listing the residence as his legal address; (4) received mail at the residence; (5) kept clothing at the residence; (6) had a child that resided at the residence; (7) kept personal belongings at the residence; (8) performed household chores at the residence; (9) was listed on the lease and/or pays rent; and (10) was allowed in the premises when the owner is not present). The evidence presented at hearing was insufficient to enable the government to carry its burden that Fredrick Lutz possessed actual authority to search the residence.

Lutz, Keys, and Andersen arrived at 419 Bowers simultaneously. When Lutz approached the residence, however, he discovered that he was unable to enter through either of the exterior doors. The door to the residence's primary entrance was secured with a padlock to which Lutz did not possess a key. Lutz testified that Defendant had never before placed a padlock on the door. The door to the residence's other entrance was secured with a more traditional lock to which Lutz likewise did not possess a key. Moreover, Lutz testified that this particular door was secured from inside the residence, thereby preventing it from serving as an entrance.

Lutz testified that he moved out of Defendant's residence in September 2008, after which his name was removed from the lease. On September 13, 2008, Lutz submitted to the Postal Service an "official mail forwarding change of address order" on which he identified 419 Bowers as his "old" address. Lutz testified that in September 2008, he began residing with his parents. With respect to the

time period following September 2008, Lutz testified that while he sometimes stayed at 419 Bowers it was not his residence. Michael Lutz, Fredrick Lutz's father, testified that while his son often stayed with Defendant, he maintained a separate residence. Fredrick Lutz testified that he did not assert to Detective Keys or Special Agent Andersen that he resided at 419 Bowers. Detective Keys testified that it was his "impression" that Lutz lived at the residence. Special Agent Andersen testified that he did not ask Lutz if he presently lived at 419 Bowers, but that Lutz gave him the "impression" that he resided there. Lutz testified that he washed his clothes at Defendant's residence, but kept no belongings there. Detective Keys testified that he understood that, as of April 22, 2009, Lutz and Defendant were estranged.

The Court recognizes that evidence was also presented that supports the government's position that Fredrick Lutz possessed actual authority to lawfully enter Defendant's residence and conduct a search therein. Lutz's driver's license identified his address as 419 Bowers Ave. Public Safety Officer Matthew Skaggs testified that on the evening of April 22, 2009, he was dispatched to Defendant's residence to investigate a separate matter. According to Skaggs, he observed mens clothing on the floor. Moreover, Defendant allegedly told Skaggs that Lutz currently lived with her. Lutz testified that he and Defendant were parents of a young girl and that he was able to go to Defendant's residence to care for her. Special Agent Andersen testified that when he later confronted Defendant with the mail seized from her residence, Defendant did not question Lutz's authority to enter her residence.

In evaluating this competing evidence, the Court is mindful that the government bears the burden of establishing that Fredrick Lutz possessed "common authority" to "access or control for most purposes" the residence in question. The Court finds that the government has not met its burden. In reaching this conclusion, the Court finds instructive the Supreme Court's decision in *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

In *Rodriguez*, Gail Fischer informed the police that she had been assaulted earlier that day by Edward Rodriguez. *Id.* at 179. Fischer further stated that Rodriguez was presently sleeping at a location which she "several times" referred to as "our" apartment. Fischer "consented to travel [to the apartment] with the police in order to unlock the door with her key so that the officers could enter and arrest him." *Id.* The police did not obtain an arrest warrant for Rodriguez or a search warrant to search the apartment in question. *Id.* at 180. When the police arrived at the apartment, "Fischer unlocked the door with her key and gave the officers permission to enter." As the police walked through the apartment, they observed in plain view several containers of cocaine. Rodriguez was arrested and charged with possession of a controlled substance with intent to deliver.

Rodriguez subsequently moved to suppress the evidence seized from his apartment on the ground that "Fischer had vacated the apartment several weeks earlier and had no authority to consent to the entry." The trial court granted Rodriguez's motion finding that Fischer "was not a 'usual resident' but rather an 'infrequent visitor' at the apartment on South California, based upon its findings that Fischer's name was not on the lease, that she did not contribute to the rent, that she was not allowed to invite others to the apartment on her own, that she did not have access to the apartment when respondent was away, and that she had moved some of her possessions from the apartment." *Id.* This determination was affirmed on appeal in the state courts, after which the Supreme Court agreed to hear the matter. *Id.* at 180-81. With respect to this particular issue, the Court stated:

> "[c]ommon authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes...." The burden of establishing that common authority rests upon the State. On the basis of this record, it is clear that burden was not sustained. The evidence showed that although Fischer, with her two small children, had lived with Rodriguez beginning in December 1984, she had moved out on July 1, 1985, almost a month before the search at issue here, and had gone to live with her mother. She took her and her children's clothing with her,

> though leaving behind some furniture and household effects. During the period after July 1 she sometimes spent the night at Rodriguez's apartment, but never invited her friends there, and never went there herself when he was not home. Her name was not on the lease nor did she contribute to the rent. She had a key to the apartment, which she said at trial she had taken without Rodriguez's knowledge (though she testified at the preliminary hearing that Rodriguez had given her the key). On these facts the State has not established that, with respect to the South California apartment, Fischer had "joint access or control for most purposes." To the contrary, the Appellate Court's determination of no common authority over the apartment was obviously correct.

*Id.* at 181-82.

While the facts in *Rodriguez* differ slightly from those in the present matter, the Court finds that such differences are quantitatively and qualitatively insignificant. The essential facts of the two circumstances are sufficiently identical that the same outcome must result. In sum, for the reasons articulated herein, the Court finds that the United States has not met its burden of demonstrating that, as of the time of the search, Fredrick Lutz possessed common authority to access or control for most purposes Defendant's residence.

**III.	Did Lutz Possess Apparent Authority to Search the Residence**

As discussed above, the search in question would be lawful if Lutz actually possessed joint access or control over Defendant's residence. However, even where an individual "in fact lacks common authority over the premises, a search conducted pursuant to his or her consent will not violate the Fourth Amendment guarantees if the police reasonably believed that the [individual] had such authority." *United States v. Penney*, 576 F.3d 297, 307 (6th Cir. 2009) (quoting *Rodriguez*, 497 U.S. at 186). The United States asserts that the search in question is lawful because Detective Keys and Special Agent Andersen reasonably believed that Lutz possessed joint access or control over Defendant's residence.

When assessing whether Detective Keys and Special Agent Andersen reasonably believed that Lutz possessed common authority over Defendant's residence, the standard is whether "the facts available to the officer at the moment [would] warrant a man of reasonable caution [to believe] that the consenting party had authority over the property." *United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008) (quoting *Rodriguez*, 497 U.S. at 188). However, "apparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity." *Purcell*, 526 F.3d at 963. As the *Purcell* court further observed:

> The government cannot establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry. . . .When a situation starts as unambiguous but subsequent discoveries create ambiguity, any apparent authority evaporates.

*Id.* at 963-64 (citations omitted).

Stated differently, this authority stands for the proposition that the police cannot circumvent the protections of the Fourth Amendment through willful ignorance. The evidence presented at hearing reveals that the situation which faced the officers was sufficiently ambiguous that further investigation was mandated.

Prior to the search, the officers knew only the following: (1) Fredrick Lutz's driver's license identified his address as 419 Bowers Ave., (2) Lutz and Defendant were at one time romantically involved, and (3) Lutz lacked the ability to enter the residence through either entrance.[2] Lutz testified that he did not assert to Keys or Andersen that he resided at 419 Bowers. Keys and Andersen both testified that they simply assumed that Lutz resided with Defendant. Because the officers made no attempt to clarify this ambiguous situation, their belief that Lutz possessed joint access or control over Defendant's residence was unreasonable.

The government has cited to several cases in support of its position that Keys and Andersen reasonably believed that Lutz possessed joint access or control over Defendant's residence. There exists, however, a key distinction between the facts of these various cases and the present circumstance. In the cases cited by the government, the person who the police believed possessed joint access or control over the area searched were either physically occupying the residence when the police arrived or were able to access the residence using a key or garage opener. *See United States v. Ables*, 280 Fed. Appx. 513, 514-18 (6th Cir., June 5, 2008) (when officers arrived at the trailer they were "met. . .at the front door" by a woman who asserted she lived in the trailer and gave the officers consent to search therein); *United States v. Ayoub*, 498 F.3d 532, 537-39 (6th Cir. 2007) (police gained access to

---

[2] With respect to this latter item, it is important to note that there is no evidence that Lutz possessed a key to either entrance, but simply did not have such key on his person at the time. There is likewise no evidence that Lutz asserted that such was the case.

search the residence from an individual who possessed a key thereto and who "provided confirmation of her own authority to consent"); *Harajli v. Huron Township*, 365 F.3d 501, 506 (6th Cir. 2004) (considering that Nada asserted that she lived at the residence in question and possessed a garage door opener which afforded her access to the house, "officers could have reasonably believed that Nada had the authority to consent to their entry inside" the residence); *United States v. Williams*, 138 Fed. Appx. 743, 745-46 (6th Cir., July 8, 2005) ("as Martinez had recently resided full-time in the apartment and her key evidenced that she still had 'common authority over the premises,' Matos' belief that she had authority to grant a search was reasonable"); *United States v. Hudson*, 405 F.3d 425, 441 (6th Cir. 2005) (officers obtained consent to search from woman who claimed to live in the residence and who possessed key thereto).

This distinction while not dispositive is significant in the present circumstance. It may be reasonable for a police officer to believe that an individual who either physically occupies a residence or possesses a means by which to gain access thereto by traditional means (e.g., key or garage opener) enjoys common authority over the premises. In the present circumstance, however, there was no evidence that Lutz possessed a key to the residence. Furthermore, Defendant took the extraordinary step of securing the primary entrance to her residence with an additional padlock to which Lutz did not possess a key. These facts should have signaled to the officers that further investigation was necessary. Such could easily have been accomplished by questioning Lutz further about the matter or speaking with Defendant, who at the time was apparently at her sister's residence a short drive away.

In conclusion, for the reasons articulated above, the Court finds that the search of Defendant's residence violated the Fourth Amendment. Suppression of the evidence seized therein is, therefore, appropriate. *See, e.g., United States v. Akridge*, 346 F.3d 618, 623 (6th Cir. 2003) (the

exclusionary rule bars the admissibility at trial of tangible evidence, as well as verbal statements, acquired through unconstitutional means) (citations omitted).

IV.   **Subsequent Questioning of Defendant**

Special Agent Andersen testified that he interrogated Defendant shortly after obtaining the illegally seized evidence from her residence. According to Andersen, Defendant initially denied stealing mail, but after being confronted with the illegally seized evidence made incriminating statements. Defendant seeks to suppress any and all incriminating statements she made to Andersen after being presented with the evidence recovered from the illegal search of her residence. Defendant asserts that any such incriminating statements must be suppressed as the fruit of the illegal search. The United States did not address this aspect of Defendant's motion to suppress in its pleadings and presented neither evidence nor argument on the subject at hearing.

As noted above, the exclusionary rule prevents the government from introducing evidence seized in violation of the Constitution. The exclusionary rule "excludes from admissibility not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Akridge*, 346 F.3d at 623 (citations omitted). Evidence obtained as a "direct result of an unconstitutional search or seizure is plainly subject to exclusion." When a defendant asserts that "evidence subsequently obtained is 'tainted' or is 'fruit' of a prior illegality," the question is whether "the challenged evidence was 'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.'" *Id.* (citation omitted).

As previously noted, Defendant incriminated herself only after being confronted with illegally obtained evidence. The Court concludes that any incriminating statements Defendant made after being presented with (or informed of) the evidence illegally seized from her residence, were obtained expressly and exclusively through exploitation of the illegal search of her residence. As the leading treatise recognizes:

> In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with incriminating evidence they had illegally seized, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak."
>
> Because this is the case, the more fine-tuned assessment which the Supreme Court mandated in *Brown v. Illinois* for determination of when a confession is the fruit of an illegal *arrest*, is ordinarily unnecessary when the "poisonous tree" is instead an illegal search. As explained in *People v. Robbins*, the two situations are quite different:
>
> Confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent. On the other hand, the custodial environment resulting from a false arrest is merely one factor to be considered in determining whether a confession is admissible.

Wayne LaFave, *Search and Seizure*, § 11.4(c) (4th ed. 2004).

Accordingly, any incriminating statements Defendant made to Special Agent Andersen after being confronted with the evidence illegally seized from her residence must be suppressed.

## CONCLUSION

For the reasons articulated herein, Defendant's Motion to Suppress Evidence, (dkt. #11), is **granted**.  An Order consistent with this Opinion will enter.


Date:  May 14, 2010                                  /s/ Ellen S. Carmody
                                                    ELLEN S. CARMODY
                                                    United States Magistrate Judge